J-A01015-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

R.E.P.

　　　　　Appellant

　　　　　v.

J.H.

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1318 WDA 2016

Appeal from the Order August 11, 2016
In the Court of Common Pleas of Allegheny County
Family Court at No(s): FD16-007048-008

BEFORE:　BOWES, OLSON AND STRASSBURGER,* JJ.

MEMORANDUM BY BOWES, J.:　　　　　　　　　**FILED APRIL 10, 2017**

　　　R.E.P. ("Father") appeals the August 11, 2016 order wherein the trial court determined that it lacked jurisdiction of the child custody dispute with J.H. ("Mother") pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), 23 Pa.C.S. § 5401, *et seq*. The court dismissed Father's custody action and directed the parties to proceed with the simultaneous custody action Mother initiated in North Carolina. We affirm.

　　　The trial court summarized the underlying facts and procedural history as follows:

　　　　　The Parties were never married. They have one child, [D.H.-P.,] born December . . . 2013 in North Carolina. [Mother and Father] met in Pittsburgh where Father was an associate professor at Carnegie Mellon University and Mother a graduate student at the University of Pittsburgh. Mother had been accepted into a six to eight year Ph.D. program at The University

* Retired Senior Judge assigned to the Superior Court.

of North Carolina at Chapel Hill (UNC). When [Mother and Father] learned Mother was pregnant, they made a joint decision to move to North Carolina so Mother could enroll at UNC and the two could co-parent their child when he was born.

[Mother and Father] lived as an intact family in North Carolina from [D.H.-P.'s] birth through June of 2015. [D.H.-P.] had a pediatrician whom he regularly saw there and took part in "play dates" with other young children and their [m]others, and attended a day care.

To preserve his tenure track position at Carnegie Mellon University, Father was required to return to Pittsburgh in 2015. Mother took a year-long leave of absence from UNC and accompanied Father to Pittsburgh on July 1, 2015, with [D.H.-P.], who was now [one] and [one-]half years old. Mother sought, only a one semester leave from UNC but was told by her faculty advisor, Dr. Jennifer Ho, that it would be better to ask for a longer leave initially and return early rather than attempt to extend a shorter leave. Mother testified it was always her intent to return to UNC to finish her program. This testimony was supported by her advisor's testimony.

[Mother and Father] rented a home in Pittsburgh and signed a one year lease. Mother did not have a job nor was she enrolled in any educational program in Pittsburgh.

While in Pittsburgh, [Mother and Father] began to experience difficulties in their relationship. . . . In August of 2015, Mother traveled with [D.H.-P.] to Nevada to visit her parents and informed Father by email that she would not return to Pittsburgh but would, instead, return to North Carolina in September. At Father's urging, [Mother] instead returned to Pittsburgh but their relationship continued to deteriorate.

On December 4, 2015, Mother again left Pittsburgh with [D.H.-P.] to visit her parents. She again informed Father via email that she would not return. In late December 2015, Father requested that Mother return to Pittsburgh with [D.H.-P.]. She did not. From Nevada, she returned to North Carolina on January 6, 2016 with [D.H.-P.], and re-enrolled in her original Ph.D. program.

Trial Court Opinion, 10/29/16, at 2-3 (footnotes and citations to record omitted).

After Mother returned with D.H.-P. to North Carolina, Father filed a custody complaint in Pennsylvania. Mother countered two weeks later by initiating a custody action in North Carolina. On May 20, 2016, the trial court entered a consent order that granted it temporary emergency jurisdiction over the matter pursuant to 23 Pa.C.S. § 5424(b) pending its decision whether to exercise or relinquish jurisdiction.[1] That order also outlined an interim physical custody arrangement, which granted Mother and Father alternating two-week periods of physical custody.

Following two days of hearings to determine whether it had jurisdiction over the custody action pursuant to the UCCJEA, on August 10, 2016, the trial court entered the above-referenced order and dismissed Father's custody action. Essentially, the trial court determined that under the facts of this case, D.H.-P. had no "home state" as the term is defined in the UCCJEA and that an evaluation of maximum significant contacts weighed in favor of

---

[1] Since Father's custody action preceded the complaint that Mother filed in North Carolina, the trial court had priority under the statutory framework to determine whether to exercise its jurisdiction. *See M.E.V. v. R.D.V.*, 57 A.3d 126, 130 (Pa.Super. 2012) ("a trial court MUST not exercise jurisdiction when another state has jurisdiction priority"); 23 Pa.C.S. § 5426(a) (regarding simultaneous proceedings).

relinquishing initial jurisdiction to North Carolina.[2] Father filed a timely appeal and a concomitant statement of errors complained of on appeal, and the trial court issued its Rule 1925(a) opinion.

Father presents the following questions for our review.

I. Whether the trial court erred as a matter of law in concluding that Pennsylvania was not the home state of the minor child under the UCCJEA thus resulting in a determination by the court that Pennsylvania did not have jurisdiction over the matter of custody of the minor child?

II. Whether the trial court erred as a matter of law in ceding jurisdiction to North Carolina even if the child had no home state under the UCCJEA.

Father's brief at 4.

At the outset, we clarify our standard of review. The crux of Father's first issue relates to the trial court's determination that it did not have subject matter jurisdiction pursuant to § 5421(a) to enter an initial child custody determination, *i.e.*, that Pennsylvania was not D.H.-P.'s home state. Typically, the determination of whether a trial court possess subject matter jurisdiction involves *de novo* review because it raises a pure question of law.

---

[2] Section 5402 defines "home state" as

The state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. . . . A period of temporary absence of any of the mentioned persons is part of the period.

23 Pa.C.S. § 5402.

*S.K.C. v. J.L.C.*, 94 A.3d 402, 408 (Pa.Super. 2014) (differentiating between an appeal from an order to exercise or decline jurisdiction, which would be subject to an abuse of discretion standard, "[A] trial court's decision that it possesses subject matter jurisdiction under section 5422(1) is purely a question of law"); *B.J.D. v. D.L.C.*, 19 A.3d 1081 (Pa.Super. 2011) (*de novo* review of appeal from order to transfer custody jurisdiction under § 5427). However, the issue in the case at bar involves neither statutory construction nor rote application of an established legal principle. Instead, as we explain *infra*, it requires a nuanced factual determination regarding the date that Mother decided that she was not returning to Pittsburgh and if that date was prior to the six-month jurisdictional trigger under the statute, *i.e.*, whether her trip to Nevada was temporary. Thus unlike the posture of *S.K.C.* and *B.J.D.*, this case involves a mixed question of law and fact that rests squarely upon the trial court's determination of fact regarding Mother's subjective intention, a finding that we are unwilling to make in the first instance in light of our deference to the trial court's role as the ultimate arbiter of fact.[3] *See R.M. v. J.S.*, 20 A.3d 496, 507

---

[3] We observe that the *S.K.C.* Court made the required factual determinations in the first instance with the *caveat*, "We only make this determination for the first time on appeal because of the extensive factual record developed in the trial court." *S.K.C. supra*, at 410 n.11. The Court also noted "the lack of a trial court determination on the legal question of exclusive, continuing jurisdiction." *Id*. Likewise, the *B.J.D.* Court gleaned
*(Footnote Continued Next Page)*

(Pa.Super. 2011) ("[W]here there is a question of whether a parent's relocation to another jurisdiction is temporary and the pleadings are insufficient to make such a determination, an evidentiary hearing on the issue must be held"); **T.A.M. v. S.L.M.**, 104 A.3d 30, 32 (Pa.Super. 2014) (utilizing abuse-of-discretion standard to review trial court's determination that it lacked subject matter jurisdiction to modify a custody determination pursuant UCCJEA Section 5423).

In **T.A.M.**, we explained the applicable standard as follows,

Under Pennsylvania law, an abuse of discretion occurs when the court has overridden or misapplied the law, when its judgment is manifestly unreasonable, or when there is insufficient evidence of record to support the court's findings. An abuse of discretion requires clear and convincing evidence that the trial court misapplied the law or failed to follow proper legal procedures.

**Id**. at 32 (citation omitted). Our review is deferential to the trial court's role as the ultimate arbiter of fact. **J.M.R. v. J.M.**, 1 A.3d 902, 911 (Pa.Super. 2010). Accordingly, we will not disturb the trial court's factual findings or credibility determinations that the certified record supports. **Id**. ("We must accept findings of the trial court that are supported by competent evidence

_(Footnote Continued)_ _____

the necessary findings of fact "[b]ased on . . . undisputed facts" in the record regarding the year that both parents departed Pennsylvania permanently. In contrast to those cases, the instant case not only involves disputed facts, but it also has the benefit of the trial court's express credibility determinations and the court's explanation for the manner it resolved the factual dispute regarding Mother's subjective intention to leave Pittsburgh permanently.

of record, as our role does not include making independent factual determinations.")

The initial step in determining whether to assume jurisdiction under the UCCJEA is to determine which jurisdiction, if any, was the child's home state. Stated simply, if Pennsylvania was the child's home state when Father filed his custody complaint, then the trial court had jurisdiction to make the initial custody determination. ***See*** 23 Pa.C.S § 5421(a)(1). However, where "there is no home state . . . there must be a determination under 23 Pa.C.S.A. § 5421(a)(2) as to which state is the more appropriate forum based on where there are the most significant connections." ***Bouzos-Reilly v. Reilly***, 980 A.2d 643, 646 (Pa.Super. 2009) (footnote omitted).

The relevant section of UCCJEA provides as follows:

**§ 5421. Initial child custody jurisdiction**

(a) General rule.--Except as otherwise provided in section 5424 (relating to temporary emergency jurisdiction), a court of this Commonwealth has jurisdiction to make an initial child custody determination only if:

(1) this Commonwealth is the home state of the child on the date of the commencement of the proceeding or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this Commonwealth but a parent or person acting as a parent continues to live in this Commonwealth;

(2) a court of another state does not have jurisdiction under paragraph (1) or a court of the home state of the child has declined to exercise jurisdiction on the ground that this Commonwealth is the more appropriate forum under section

- 7 -

5427 (relating to inconvenient forum) or 5428 (relating to jurisdiction declined by reason of conduct) and:

(i) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this Commonwealth other than mere physical presence; and

(ii) substantial evidence is available in this Commonwealth concerning the child's care, protection, training and personal relationships[.]

23 Pa.C.S. § 5421(a). As we indicated *supra*, the statute defines the home state as "[t]he state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding [including any period of temporary absence[.]" 23 Pa.C.S. § 5402.

Presently, the trial court found that Mother and D.H.-P. left Pennsylvania permanently during December 2015, which was slightly less than one month before the six-month jurisdictional threshold outlined in § 5421(a)(1) was triggered. Therefore, the court concluded that Pennsylvania was not the child's home state under the statute. Moreover, the court reasoned that, since the family had relocated from North Carolina over six months earlier, that state did not satisfy the statutory definition either. Thus, the court found that D.H.-P. did not have a home state under the statute and that, pursuant to the § 5421(a)(2) analysis, between Pennsylvania and North Carolina, the child had more significant contacts with North Carolina.

The first component of Father's argument assails the trial court's finding that Pennsylvania was not the home state. Father asserts that Mother's travel to Nevada during December 2015 was temporary, and but for the trial court's failure to include Mother's month-long trip in its calculation of the six-month jurisdictional determination under § 5421(a)(1), Pennsylvania would have initial jurisdiction over this matter. Thus, Father argues that the trial court erred in failing to include the entirety of Mother's December 2015 trip to Nevada in its calculation of the six-month milestone to trigger home-state jurisdiction. We disagree.

The certified record is replete with evidence of Mother's intention to leave Pennsylvania permanently in December 2015. During the evidentiary hearing, Mother testified that, from the outset, she was hesitant about leaving North Carolina and returning to Pittsburgh with Father. N.T., 7/13/16, at 55. Eventually, she decided to take the one-year leave of absence from her Ph.D. program at UNC in order to appease Father, who desired that she abandon the program entirely. *Id*. at 57. Notwithstanding Father's position, Mother intended to remain in Pittsburgh only for two academic semesters and return to North Carolina during the summer of 2016. *Id*. at 54.

The family arrived in Pittsburgh on July 1, 2015; however, as early as September 2015, Mother confirmed with Father that she intended to return to North Carolina to pursue her Ph.D. *Id*. at 63. Mother and Father's

- 9 -

romantic relationship steadily deteriorated since their return to Pittsburgh, and it endured a brief estrangement brought about by Father during late August 2015 before he terminated it permanently during early November of that year. *Id*. at 58, 63, 65. Following the split, Mother repeated her desire to return to North Carolina and complete her Ph.D. *Id*. at 65. She booked one-way passage for her and D.H.-P. to travel to Nevada to visit her parents, "so that [they] could figure out how to end [the] relationship in a way that made sense and was calm and respectful." *Id*. at 64. The flight was scheduled for December 4, 2015.

The relationship remained amicable over the following ten days while Mother awaited the scheduled departure date. Mother and Father discussed several short-term options, including Mother and D.H.-P. remaining in Nevada. *Id*. at 65. Again, Mother reiterated her long-range plan of returning to North Carolina permanently with their son, which she stated Father supported at that time. *Id*. However, before Mother and D.H.-P. were scheduled to leave for Nevada, Mother discovered emails wherein Father invited another woman to spend the evening at the family residence on the night that Mother and D.H.-P. were scheduled to depart. *Id*. at 66-67. That incident placed the prior tentative discussions in disarray.

Mother flew to Nevada as scheduled, and during the course of the next three weeks, Mother and Father communicated via text and email while she remained in Nevada and visited family in nearby states. *Id*. 67, 69-70;

Mother's Exhibit F.  On December 14, 2015, Mother sent Father an email outlining short-term and long-term options.  Neither the body of her email nor the options that she proposed in the attachment established conclusively Mother's intent to leave Pennsylvania permanently nor her acquiescence to anything other than a temporary return to Pittsburgh.  The email informed Father, "until we come up with a decision together about the short and long-term future, I don't feel secure. It is much healthier for [D.H.-P.] and I emotionally and financially to be around my support system [in Nevada] until we can come up with a preliminary agreement about such things as housing, finances, custody, child support. etc."  Mother's Exhibit F. Thereafter, she reiterated, "Again, nothing is set in stone, but I do want to come to a fairly concrete agreement by the end of the month." *Id*.  She added, "our return to Pittsburgh depends on us having concrete plans for housing, financing and other short and long-term plans." N.T., 7/13/16, at 78.  Thus, while not definitive of her ultimate intent to leave Pennsylvania permanently, Mother's email communications demonstrated her uncertainty whether she would ever reside in the Commonwealth again.

Likewise, the options that Mother outlined in the email attachment proposed both 1) retuning to Pennsylvania for approximately four months before moving to North Carolina; and 2) remaining in Nevada "for several months" before moving to North Carolina directly from that state.  *Id*. Significantly, however, **all** of Mother's options involved her ultimate return to

- 11 -

North Carolina to complete her Ph.D. program. *Id*.; N.T., 7/13/16, at 76-77. She explained, "Returning to North Carolina is the obvious answer for [me and D.H.-P]. I've thought a lot about it and [I] am going to finish my degree . . . to have the best chances for finding sustainable work when I finish." Mother's Exhibit F.

On December 20, 2015, Mother contacted Dr. Jenifer Ho, her faculty advisor, and inquired about returning to the program before the conclusion of her year-long leave of absence. N.T., 7/13/16, at 75. The next day Mother submitted a request with the United States Postal Service to change her address from 1718 Duffield Street, Pittsburgh, Pennsylvania to 5005 Heatherbrook Circle, Raleigh North Carolina, effective immediately. *Id*. at 92-93, 157; Mother's Exhibit J. Dr. Ho's testimony confirmed that, following further discussions regarding a teaching fellowship, Mother was permitted to return from her leave of absence early and re-enroll for the 2016 spring semester. *Id*. at 15-16, 20.

Thereafter, on December 29, 2015, Mother informed Father that she was moving to North Carolina in order to terminate her leave of absence early and return to her Ph.D. program. N.T. 7/13/16, at 87; Mother's Exhibit F. One week later, she and D.H.-P. flew to Chapel Hill North Carolina, arriving on January 6, 2016.

The forgoing evidence supports the trial court's finding that Mother's trip to Nevada was not a temporary retreat but rather an attempt to regroup

and decide her future. The record will not sustain the court's finding that Mother intended to leave Pennsylvania permanently when she boarded the plan on December 4, 2015. Mother endured the first two weeks of December in limbo at her parent's Nevada home while she decided what actions would be best for her and D.H.-P.

However, Mother's intent to leave Pennsylvania permanently was clearly manifest on December 21, 2015, when she submitted a request to officially change her mailing address to North Carolina in anticipation of securing a teaching fellowship and continuing her Ph.D. program. She told Father of her specific plans approximately one week later. Accordingly, the certified record sustains the trial court's factual determination that Mother formed her intention to leave Pennsylvania and informed Father of that decision prior to the six-month jurisdictional trigger under § 5421(1). Mother removed D.H.-P. from Pennsylvania during December 2015, and after a month-long layover in Nevada, she moved permanently to North Carolina. While Mother may not have intended to leave Pittsburgh permanently on the date that she departed, her intentions became obvious as early as the December 21, 2016 and she never returned to the Commonwealth prior moving to North Carolina. Hence, Mother formed the intent to relocate from Pennsylvania permanently prior to the date home-state jurisdiction vested. Thus, no relief is due.

We also reject Father's alternative argument that Mother left Pittsburgh under the false pretense that her trip was temporary. Father invokes Mother's failure to comply with the relocation provisions outlined in Pennsylvania's Child Custody Law as proof of her misconduct. He contends that, under these circumstances, where Mother allegedly left Pittsburgh ostensibly for a short-term family visit, the trial court erred in failing to characterize the child's absence as temporary for the purpose of determining whether Pennsylvania was the home state.

Father's assertion fails for at least two reasons. First, Father cannot demonstrate *scienter*, *i.e.*, that Mother knowingly fled Pittsburgh with no intention of returning. Contrary to Father's supposition, the certified record is replete with evidence that Mother traveled to Nevada to stay with her parents following the couple's break up and to figure out her future plans. As we discussed thoroughly *surpa*, Mother was engrossed with achieving a solution that made sense to all three family members, and she did not foreclose a return to Pittsburgh until mid-December when it became clear that she could return to her Ph.D. program in time for the 2016 spring semester. Father failed to present a scintilla of evidence to corroborate his allegation of Mother's devious scheme to circumvent the jurisdictional trigger, much less counter the competent evidence of record that she adduced regarding her good-faith intentions throughout this ordeal. This claim fails.

Moreover, to the extent that Pennsylvania lacked subject matter jurisdiction over the child custody case, Mother was not required to comply with the notice requirements outlined in Pennsylvania's Child Custody Law. Stated plainly, since the trial court lacked the authority to rule on the issue of relocation, Mother's noncompliance with the inapplicable relocation proviso is neither evidence of a false pretense nor a substantive basis to disturb the trial court's determination that home state jurisdiction did not vest in Pennsylvania. Thus, we also reject this position.

Having found that the certified record supports the trial court's finding that Pennsylvania was not the home state for purposes of making an initial custody determination under § 5421(a), we next address Father's second issue relating to the trial court's "maximum contacts" analysis under § 5421(a)(2)(i) and (ii). This argument implicates the court's decision to exercise or relinquish jurisdiction over the custody case in the absence of home-state jurisdiction. Accordingly, we review that aspect of the court's decision for an abuse of discretion. *Wagner v. Wagner*, 887 A.2d 282, 285 (Pa.Super. 2005) ("A court's decision to exercise or decline jurisdiction [per the UCCJEA] is subject to an abuse of discretion standard of review[.]").

Preliminarily, we observe that neither party currently challenges the trial court's determination that North Carolina lacked home state jurisdiction, although Mother did proffer that argument below. Additionally, we note that the trial court's maximum-significant-contacts analysis was the correct

procedure to determine in which state jurisdiction properly lay in the absence of home state jurisdiction. *See R.M.*, *supra*, at 506 (citing *Dincer v. Dincer*, 701 A.2d 210, 215 (Pa. 1997)).

Father complains that the trial court erred in discounting the significance of the five months that D.H.-P. resided in Pittsburgh and ignoring evidence regarding the child's contacts in Pennsylvania. Specifically, Father invokes evidence that D.H.-P. had a physician in Pennsylvania, with whom he was treated at least once, and that the parties had an active social life in the area. Father's argument is unpersuasive.

Pursuant to § 5421(a)(2), the test for maximum contacts includes whether the child and at least one parent has significant connections to the Commonwealth or North Carolina beyond mere physical presence in the state and if there is substantial available evidence in the Commonwealth or North Carolina concerning D.H.-P.'s care, protection, training and personal relationships.

Instantly, the trial court explained its rationale as follows:

In this case, there are more significant connections to, and substantial evidence in, North Carolina concerning [D.H.-P.'s] care, protection, training, and personal relationships than in Pennsylvania.

[D.H.-P.] spent his first two and a half years in North Carolina where he and Mother, as well as Father, were known, and had a support system. He had a regular pediatrician in North Carolina where he received routine care and where his records would be kept. He attended a day care and had regular play group interactions. While a pediatrician was engaged for [the

child] in Pennsylvania, a relationship with a pediatrician was not established.

Trial Court Opinion, 8/20/16, at 6/ (citations to record omitted).

Notwithstanding the trial court's miscalculation of the period that D.H.-P. resided in North Carolina as thirty months rather than eighteen months, the record supports the trial court's finding of maximum significant contacts with North Carolina. D.H.-P. was born in North Carolina and lived in the state for the first one and one-half years of his life before moving to Pennsylvania for approximately five months. During the evidentiary hearing, Mother presented competent evidence to establish that her and D.H.-P.'s friends, playgroups, support system, and mother's club were all located in North Carolina. N.T., 7/13/16, at 92. Moreover, that state was the site of Mothers' employment, and education, her and her son's health insurance, and D.H.-P.'s childcare. *Id*. at 92-93. Furthermore, Mother had friends in the area to provide alternative childcare if needed. *Id*. Her automobile remained registered in North Carolina, and she considered herself a resident of that state. *Id*. at 132.

As it related to her son's contacts, Mother testified that D.H.-P. had several pediatric appointments in North Carolina, he attended daycare in North Carolina and participated in two to three playdates per week. *Id*. at 94-95. In contrast, she and D.H.-P. had minimal social contacts in Pittsburgh. *Id*. at 96. Mother explained that two of her acquaintances in

Pennsylvania had children, but the family was not in Pittsburgh long enough to establish friendships beyond an isolated playdate. *Id*. at 97. Neither parent has family in the area. *Id*. at 97; 175.

In contrast with the significant contacts with North Carolina, Mother and D.H.-P. shared few connections with Pennsylvania. Mother did not have any current ties to Pennsylvania. She never had employment or health care in Pennsylvania and neither parent owned property in the Commonwealth. *Id*. at 174. While Mother had been issued a Pennsylvania driver's license during 2012, while she was a student at the University of Pittsburgh, that identification expired during January 2016, and she obtained a North Carolina driver license when she returned to that state. *Id*. at 175.

Likewise, D.H.-P.'s contacts with Pennsylvania were sparse. Other than father, the child does not have family or friends in the Commonwealth. While he was here for the most recent five months prior to the initiation of litigation, he did not establish any meaningful relationships in that time. Father presented no evidence that D.H.-P. belonged to any clubs, classes, or organized activities in Pennsylvania. He had never been enrolled in daycare in Pennsylvania and was not part of a playgroup. At most Father presented evidence that he maintained his son's state-sponsored health insurance and the child had one visit with the pediatrician. For all of the forgoing reasons, we find that the record supports the trial court's finding that D.H.-P.'s maximum significant contacts rest with North Carolina and therefore, that

state was the appropriate jurisdiction to make the initial custody determination pursuant to § 5421(a).

Finally, Father asserts that, to the extent that the evidence supported a finding of significant contacts in both states, the trial court was constrained to assume jurisdiction over the custody matter under the first-to-file rule. This aspect of Father's argument is waived because he failed to raise it in his concise statement of errors complained of on appeal pursuant to Rule 1925(b). **See** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived").

Order affirmed.

Judge Olson joins the memorandum.

Judge Strassburger files a concurring memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/10/2017